EPHRAIM V. HORN et al., Appellants, *v.* LOREN R. PULL-MAN et al., Respondents.

There is no presumption against a will because made by a person of advanced age ; nor can incapacity to make a will be inferred from an enfeebled condition of mind or body.   If the testator has sufficient intel-

ligence to comprehend the condition of his property, his relation to those who are or may be the objects of his bounty, and the scope and meaning of the provisions of his will, and if it is his free act, it will be sustained.

A change of testamentary intention is important sometimes as bearing upon the question of undue influence, but its force depends mainly upon its connection with other facts. If the change is made upon a reason satisfactory to the testator, it furnishes no ground for setting aside the will, although the reason may seem inadequate to a court investigating the question.

The question in all such cases is simply, was the will the free act of a competent testator ? The fact that its provisions were inequitable and unjust, furnishes no ground for disturbing it.

H., a man eighty-three years of age, and of impaired mental and physical powers, made a will, leaving the bulk of his property to C., a grandson, and his wife, to the exclusion of the children of the testator. He had made three prior wills ; by the first two the bulk of his property was left to his three sons ; the third will was substantially like the one in question. C. and his wife, for about six years before the making of the last will, had lived with the testator and cared for him, and C. had managed his farm. The will stated that the provision for C. and wife was made because of the affection he bore them, and for "the faithful care and support" of his declining years. The testator's own children lived elsewhere, visited him but seldom, and declined to have him live with them. Of this he complained. His relations, however, with them were friendly. The testator acted intelligently in matters of business which engaged his attention, and in other matters. His attending physician, who was also a subscribing witness to the will, gave his opinion as a witness that neither the mental nor bodily infirmities of the testator affected his competency. The testator gave all the instructions as to the drawing of the will, without suggestions from any one, and stated the reason for the changes he desired to have made. After the will was drawn it was read over to him, and he pronounced it right. Neither C. nor his wife were present, and it did not appear that they did any act to influence the testator. *Held*, that the evidence failed to show want of mental capacity, or to establish a case of undue influence ; and that the will was properly admitted to probate.

The surrogate rejected proof of declarations of the wife of C., made after the testator's death, to the effect that she and her husband had consulted a physician before the will was made as to the testator's competency ; that they had got the property, and had it so fixed that if the testator's children contested the will they would have to pay costs, and that the testator would do anything she asked him to. *Held*, that, assuming the evidence admissible both against the witness and her husband, its exclusion did not call for a reversal of the surrogate's decree, as the result would not have been changed by the evidence offered.

(Argued January 16, 1878 ; decided January 29, 1878.)

APPEAL from a judgment of the General Term of the Supreme Court, in the fourth judicial department, affirming a decree of the surrogate of Herkimer county, admitting to probate the last will and testament of Cornelius Horn, deceased. (Reported below, 10 Hun, 474.)

The facts are sufficiently set forth in the opinion.

*H. J. Cookingham,* for appellants. The burden of proof was upon the proponents. (*Lake* v. *Renney,* 3 Barb., 49.) The testator was not at the time of making the will in question of sound mind and memory. (*Delafield* v. *Parish,* 25 N. Y., 9; *Weir* v. *Fitzgerald,* 2 Bradf., 42; *Van Hansyker* v. *Weise,* 44 Barb., 494; *Creely* v. *Ostrander,* 3 Bradf., 107; *Gaurbault* v. *Public Admr.,* 4 id., 226; *Morley* v. *Silsber,* 2 Bradf., 133; *Gamble* v. *Gamble,* 39 Barb., 373; *Love* v. *Johnston,* 12 Ire. L. R., 355.) This will was procured by undue influence. (*In re Welsh,* 7 N. Y. Leg. Obs., 153; *Laycraft* v. *Simmons,* 3 Bradf., 35; *Lee* v. *Dill,* 11 Abb., 384; *Ingram* v. *Wyatt,* 1 Hagg., 384; *Marsh* v. *Harding,* 2 id., 84; *Mackenzie* v. *Handarger,* id., 211; *O'Neil* v. *Murry,* 4 Bradf., 311; *Tyler* v. *Gardiner,* 35 N. Y., 559; *Clark* v. *Fisher,* 2 id., 498; 1 Paige, 171; *Darley* v. *Darley,* 3 Bradf., 481, 507; *Morley* v. *Silsber,* 2 id., 133; *Vreeland* v. *McClelland,* 1 id., 393; 1 Jarm. on Wills, 42; *In re Welsh,* 1 Redf., 238; *Lee* v. *Dill,* 11 Abb., 214; *Reynolds* v. *Root,* 62 Barb., 250; *Crispell* v. *Du Bois,* 4 id., 393; *Coffin* v. *Coffin,* 23 N. Y., 9; 2 Phill., 323.) It was error to reject the admissions of Mrs. Pullman offered in evidence. (*Robinson* v. *Hutchinson,* 31 Vt., 443; *Brush* v. *Holland,* 3 Bradf., 240; Redf. on Surr.; 99 Greenl. on Ev., § 174; *Jackson* v. *Vail,* 7 Wend., 125; *Osgood* v. *Manhattan Co.,* 3 Cow., 612; *Atkins* v. *Sawyer,* 1 Pick., 192.) When one is in a position to take advantage of a testator and he receives a benefit from him, he must show clearly that his conduct has been righteous, and that he has not taken advantage of his peculiar relations. (*Ingram* v. *Wyatt,* 1 Hagg., 384; *Marsh* v. *Tyrell,* 2 id., 84; *Mackenzie* v. *Handarger,* id., 211; *Gibson*

v. *Jeyes,* 6 Ves., 266; *Hugnenin* v. *Baseley,* 14 id., 273; *Peacock* v. *Evans,* 16 id., 517; *Fox* v. *Mackreth,* 2 Brown Ch., 400; *O'Neil* v. *Murry,* 4 Bradf., 311; *Tyler* v. *Gardiner,* 35 N. Y., 559; *Rollwagen* v. *Rollwagen,* 63 id., 504.)

*S. S. Morgan,* for respondents. The proponents of a will must establish the fact that the testator signed the will with full understanding of what it was and its provisions, and that he was of sound and disposing mind, and free from restraint or undue influence. (Redf. L. & Pr. Surr. Ct., 73–89.) There was sufficient proof of testamentary capacity. (*Burger* v. *Hill,* 1 Bradf., 360; *Delafield* v. *Parish,* 25 N. Y., 9; *Van Guysling* v. *Van Kuren,* 35 id., 70; *Tyler* v. *Gardiner,* 35 id., 559; *Stewart* v. *Lispenard,* 25 Wend., 253; *In re Forman,* 54 Barb., 274.) There was no evidence showing undue influence or fraud. (*Seguin* v. *Seguin,* 3 Keyes, 663, 669; *Gardner* v. *Gardner,* 34 N. Y., 162; *Clapp* v. *Fullerton,* id., 190; *Blanchard* v. *Nestle,* 1 Den., 37.) Declarations of the testator, made subsequent to the making of the will, could not be received to establish duress; nor could declarations of a third person be received on that question. (*Jackson* v. *Kniffen,* 2 J. R., 31; 30 Miss., 269; 6 W. & S. [Penn.], 431.)

ANDREWS, J. The will of Cornelius Horn, the validity of which is the subject of this controversy, was executed on the 19th day of June, 1875, at his house in the town of Russia, Herkimer county, and the testator died on the second day of September of the same year, being then of the age of eighty-three years. He left six children, three sons and three daughters, surviving him, the youngest being about forty-five years of age. The wife of the testator died many years before him. The contestants are the three sons and two of the daughters of the testator, and they contest the will on the ground that there was an absence of testamentary capacity in the testator when the will was made, and also that it was procured by undue influence of the principal beneficiaries. The surrogate admitted the will to probate, and his decree was affirmed at General Term.

The testator, by the will in controversy, gives to each of his children a legacy of five dollars, and the residue of his real and personal estate to his grandson, Cornelius Pullman, and his wife, Sarah M. Pullman, subject to the payment of his debts, and the expenses of his last sickness and of his burial. He had made three wills prior to the one in controversy. The first will was made in August, 1872, while upon a visit at the house of his son Ephraim, in Oneida county, where for several weeks he was detained by sickness. By this will he gave legacies to his daughters; $200 to his daughter Mrs. Pullman ; $250 to Mrs. Abel ; and to his three sons—Ephraim, Henry and Hartley—he gave the residue of his estate. The second will was made in August, 1873, by which he gave legacies of from $100 to $300 to each his daughters, the legacy to Mrs. Pullman being the largest, and also a legacy of $300 to his grandson Cornelius, and made his sons, as in the first will, his residuary legatees. The third will was made in October, 1874, and is substantially like the will in question, except that it contained a condition for the care, support and maintenance of the testator by his grandson and his wife.

The testator, in the will now in controversy, declares that the devise and bequest to Cornelius and his wife is made " in payment and satisfaction of the affection I bear them, and of and for the faithful care and support of my declining years rendered by them;" and the will of 1874, also contains expressions indicating affection and gratitude on the part of the testator to his grandson and his wife, for their kindness and care. The testator, when the will in question was made and at the time of his death, owned a farm of seventy-five acres in the town of Russia, upon which he had lived for about thirty years, and his real and personal estate together was of the value of about $3,000. In 1869, his grandson Cornelius and his wife went to live upon the testator's farm, and in his house, and the testator lived with them from that time to his death. Cornelius managed the farm and his wife conducted the affairs of the household, and they had the care

of the grandfather. One of the sons of the testator and two of his daughters lived within one to two miles of his house, and two of the sons lived in the county of Oneida. The children did not see their father frequently. One of the sons saw him "on average about twice a year;" another, "as often as once a year for the last five or six years;" another, "was there in the winter before he died;" one daughter, during the last year or two of his life, saw him "a few times." The witnesses, whose language I have quoted, are referring to the occasions when they saw the testator at his house. Occasionally the testator visited his children, but these visits were infrequent, and except on the occasion of the visit to his son in 1872, when he was taken sick, were short. So far as it appears the relations existing between the testator and his children were, in a general sense, friendly, as were also the relations between the children of the testator and his grandson and his wife.

The facts bearing upon the testamentary capacity of the testator in June, 1875, disclosed by the evidence, leave no doubt, I think, of his competency to make a will. He had infirmities incident to advanced age. The sickness of 1872 left him enfeebled in body. He had at times dysentery of somewhat chronic character, and during the last few years of his life was troubled by a retention of urine, for which difficulty he was obliged to resort to medical assistance. His sight and memory was considerably impaired. He took no active part in the business of the farm for several years before he died. He was much more quiet and reserved during the last two or three years than he had formerly been, and did not readily engage in conversation, and was less cheerful, " and did not like to joke" as formerly. Some of the witnesses state that for a year or two before his death he would repeat questions, sometimes two or three times during the same conversation, but a number of witnesses, his neigh. bors, and others who saw him more frequently than those who spoke of this fact, state that they had never observed it. He sometimes did not readily recognize persons with whom

he was acquainted, and had to be told who they were; but the instances given by witnesses are most, if not all of them, consistent with the theory that his failure to recognize acquaintances was owing to his defective sight. It would not be useful to consider in detail the evidence given, on the part of the contestants, to establish the want of testamentary capacity in the testator. Standing alone, it would be insufficient to avoid the will upon this ground. It does show impaired mental and bodily powers, but it falls short of establishing that the testator did not understand his relations to his children and others, the condition of his property, and the nature and effect of a testamentary act. He made sensible replies to questions put to him, and talked intelligently upon ordinary topics. The proponents introduced much evidence bearing upon the testable capacity of the testator. He was a man of limited education, but he could read, and within a few months before his death he borrowed of a neighbor the life of " Lincoln " and another book, which he read. He paid the school-tax in 1872–3 and 1874, and on each occasion before paying insisted upon examining the tax-list to see if the amount claimed was correct. On the fifth of July, before his death, he went to the house of his son Henry and surrendered to him a note he held against him, and on the same day applied to a person who owed him a small debt for payment, and received a bill, giving back the change. There are a variety of other circumstances proved, tending to show that the testator acted intelligently in the matters which engaged his attention. His sphere of action was limited. The small matters of business referred to seem trivial, but they are as important as any of the interests which the testator had, aside from the management of the farm, which was committed to his grandson. Dr. France was his physician during the last five years of his life, and visited him in that capacity. He states that he had frequent conversations with the testator during the five or six months preceding his death, and that he discovered that his memory of recent events was impaired. Dr. France was one of the subscribing witnesses

to the wills of 1874 and 1875. He expresses the opinion that neither his mental nor bodily infirmities affected his competency to make a will. The circumstances attending the making of the will in question, as related by Dr. France and by Mr. Carpenter, the draughtsman of the will, and the other subscribing witness, which will be referred to more particularly hereafter, strongly support the conclusion reached by the surrogate upon the question of the testamentary capacity of the testator.

There is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body. Such a rule would be dangerous in the extreme, and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property, and the scope, meaning and effect of the provisions of the will. It is, we think, quite clear, that the objection to the will in question, on the ground of the absence of testable capacity in the testator, cannot be sustained.

The allegation of undue influence, on the part of the principal beneficiaries in procuring the will, has its principal support in the circumstance of the change of testamentary intention of the testator existing when the wills of 1872 and 1873 were made, to the prejudice of his children, and the substitution of the grandson and his wife in their place, as residuary legatees. A change of testamentary intention, as bearing upon the allegation of undue influence in procuring a will, is sometimes an important circumstance. But its force depends mainly upon its connection with associated facts. If made upon a reason satisfactory to the testator, although it may seem inadequate to a court investigating the question of undue influence, it furnishes of itself no ground for setting aside the will. A testator has a right to dispose of his estate in any way he may deem best. He is not required to make an equitable will, and he may if he choose exclude

his children, or divide his estate among them unequally. The question in all such cases is, was the will the free act of a competent testator. The reasons for the change of intention in this case do not very satisfactorily appear. But the evidence shows that the testator complained frequently during the last two years of his life that his children were unwilling that he should live with them. It appears that in 1872 he thought of selling his farm, and on that occasion it is admitted that he had some conversation with his son Ephraim about going to live with him, and Ephraim proposed to take him, provided he would at his own expense build an additional room to the house ; and the testator said that another son was unwilling to have him, because his mother-in-law was living with him. The reasons given by the sons for not having their father live with them may have been entirely true and adequate, but the proof shows very distinctly that their conduct in the matter was attributed by the testator to an unwillingness, on their part, to take care of him. This affords some explanation of the change of intention, on his part, in respect to the disposition of his property. It is to be observed, moreover, that the beneficiaries were not strangers in blood. They had for six years before the testator's death taken care of him, and so far as the evidence shows treated him kindly. Several witnesses testify to his speaking of their kindness to him. There is an entire absence of any evidence that the grandson or his wife did any act to influence the testator in making his will. The only evidence bearing upon this point is furnished by Mrs. Henry Horn, who testifies that on the 5th day of July, 1875, the testator was at her house, and in the course of a conversation her husband said to him : " I understand you have deeded your property to Cornelius Pullman," and he said, " I have not deeded it to him, but I have willed it to him," and being asked by the son how it was that he had willed his entire property to Cornelius, the testator replied " that Sarah Pullman had hell-pecked him all the time until he was obliged to do what he did." Mrs. Pullman testified

that she had never talked with the testator in reference to making his will or the disposition of his property, and aside from this declaration of the testator there is no evidence that she ever did and his declaration is mere hearsay and no evidence of the facts stated. It also appears that after the testator left the house of his son on this occasion, he said to the witness Moon that he came down to "hold the *fourth* with his children, but they wanted to quarrel with him, and he did not feel as though he wanted to quarrel and he was going home." The will was drawn, on the day it bears date, by Mr. Carpenter, who was sent for by the testator to draw it. No persons were present at the time, but the testator, Mr. Carpenter and Dr. France, except that Mrs. Pullman came into the room for a moment during the interview. The testator, according to the testimony of Mr. Carpenter and Dr. France, gave the instructions for drawing the will without suggestion from any one, and stated the reasons for the changes he desired to have made. He said that the executor named in the will of 1874, was dead, and it was necessary to appoint a new one, and that he wanted the condition as to support, contained in the will of 1874, left out of the new will, as it might lead to litigation. He complained at this time of the treatment of his children. The will after it was drawn was read over to him, and he said it was right and then signed it. It would not be profitable to go into further detail of the evidence. It is sufficient to say that it fails to establish a case of undue influence. The change of intention, on the part of the testator, was deliberately formed; the beneficiaries were proper objects of his bounty, and the circumstances proved do not justify the belief that the will was the result of contrivance, or that it was made under any present, operative and controlling force exerted by the beneficiaries or other persons upon the mind or will of the testator. It may have been unjust towards the testator's children, but that furnishes no ground for disturbing it.

The surrogate rejected proof offered by the contestants of the declarations of Sarah Pullman, one of the beneficiaries,

made after the death of the testator, to the effect that they (meaning the witness and her husband,) had consulted a physician before the will was made as to the testator's competency to make a will; that they had got the property, and had it so fixed that if the testator's children contested the will they would have to pay the costs, and that her grandfather was a nice old man, and would do anything she asked him to. Assuming this evidence to be admissible as against both the witness and her husband, we think the exclusion does not call for a reversal of the decree. The case was not made out on the proof taken, and the result we think would not have been changed if the evidence offered had been admitted.

The conversation between Jane Horn and Sarah Pullman, in the presence of her husband, if admitted, would not have strengthened the contestants' case. It tended to show that Sarah believed that she and her husband were entitled to the grandfather's property, and the reason she gave for it, if true, went far to justify this belief.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.