Rollins, J.
The decedent died at her residence in this city on the 20th of June, 1885, leaving as her surviving next of kin two brothers, Meyer Oppenheimer and Baer Oppenheimer, the former residing in New York and the latter in Hamburgh, Germany. These brothers join in opposing the probate of an instrument that was lately propounded as Mrs. Weil’s last will and testament, and regarding the authenticity, validity and legality of which, certain evidence has been taken before the surrogate on behalf of the contending parties. — That the disputed instrument was duly executed has been established to my entire satisfaction. Indeed, as regards the regularity of its execution, counsel for the objectors makes no claim that it should be refused probate.
He rests his opposition upon two grounds: 1st, the decedent’s alleged testamentary incapacity; and 2nd, her alleged subjection to undue influence and control.
The will, which bears date April 12, 1885, two months before Mrs. Weil’s death, undertakes to dispose of her entire estate, which is admitted to consist wholly of personalty and to be of the value of about $ 5,000. It bequeathes nothing to her relatives except the sum of $5 to her brother Meyer : a legacy that was manifestly given, merely as an affirmative declaration of her purpose that Meyer should have no substantial portion of her estate.
Certain wearing apparel and $ 50 in money are bequeathed to Rosa Straus, who in the last illness of the decedent acted as her nurse: her washerwoman, Kate Minister, is bequeathed 120: her executor is directed to expend $ 50 in procuring prayers to be read for the repose of her soul, and not more than $ 150 for the erection of a headstone at her grave and the construction of a fence around her burial plot.
The most important dispositive provision is the following:
“ All the rest, residue and remainder of my estate, consisting of household furniture, bed linen, etc., one red shawl, my gold watch and chain, all the money in banks or in my possession at the time of my decease, I give to Mrs. Hannah Hoffman of 358 East 10th St.”
The disputed paper appoints Joseph Waldeck' as its executor. Mr. Waldeck, who is engaged in the insurance busness in this city, made decedent’s acquaintance about six or seven jmars before she died and when she was about sixty years of age. Thenceforth down to the time of her death he was accustomed to transact for her from time to time small matters of business.
Early in the year of 1885 Mrs. Weil advised Waldeck of her purpose to make a will and asked him to secure the services of some person competent to prepare such an instrument.
*365 Mr. Waldeck selected for that task Mr. Ansbacher, a lawyer, whom he had employed as counsel in some affairs of his own. Ansbacher soon afterwards waited upon the decedent at her rooms, but went away without drawing a will or receiving any instructions regarding its preparation, the decedent giving him to understand that she had decided to postpone the matter. She again brought it to Waldeck’s attention in the following April. On the 10th of that month, Waldeck having secured anew the services of Ansbacher, repaired with him and with one Louis Frank to Mrs. Weil’s apartments in East 10th Street, near Avenue C. There Ansbacher received from the decedent oral instructions for the will which he proceeded to incorporate into the paper now before me. When that paper had been fully prepared it was executed under Ansbacher’s supervision in the presence of Frank, Waldeck and himself. The three were examined at the trial and each of them gave his version of the transaction.
Their statements are in some respects variant, but the discrepancies are not of great importance and are quite consistent with a purpose on the part of all to reveal the truth.
The decedent seems to have distinctly declared her wishes as to the gravestone and the fence about the cemetery lot, and to have made it clear to her hearers that she was unwilling that the expense should exceed $150.
She was asked who were nearest kinsfolk and what were her purposes regarding them. She said that she had a brother living up town, but protested by various forms of expression that will presently be specified that he had neglected her and that accordingly she did not wish to leave him anything.
To an inquiry whether she had any relatives in Germany she replied, “Well about them I don’t want to know any thing; don’t mention them.”
It is very apparent from the testimony as a whole tnat the decedent’s resolve to make a will sprung from a. disposition to prevent the consequences that would flow from her dying intestate, more than from a disposition to benefit those whom she has selected as the objects of her bounty. But in this respect the paper before me does not greatly differ from many other and more important testamentary instruments that have fallen under my observation.
If this decedent was a free and capable testatrix her will must stand, even though her sole aim in bringing it into existence was to cut off her relatives from receiving the property which in the absence of a will they would take by virtue of the Statute of Distributions.
It was, as I believe from the evidence, a wish to prevent these contestants from enjoying her posthumous estate that prompted the decedent to announce to Waldeck early in 18S5, her wish that he should himself be the object of her testamentary bounty.
*366 This proposal to which Waldeck refused to accede, she renewed while Ansbacher was engaged in preparing a draft of the will. Waldeck again declined and offered a suggestion that if she were determined to ignore her relatives in disposing of her estate she might very properly give it to some charitable institution. This suggestion meeting with no favor, Waldeck asked her if she did not have some friend who had been kind to her during her long illness. The' decedent at once replied, “ Yes, the butcher woman across the street ” (referring to the legatee, Hannah Hoffman, whose husband was a butcher) “ has been very kind.” Waldeck said, “Well, give it to her then,” and, as regards the bulk of her estate, this is what Mrs. Weil decided to do, and has undertaken to do by the paper before me.
Now what inference must be drawn from the fact, if it be a fact, that when she summoned the lawyer to draft that paper, she had not fully decided whom to make her principal legatee ? I intimate a doubt as to whether she had reached a decision, or not, because it is possible that in spite of Waldeck’s protestations she may have believed that he would at last consent to become the recipient of her bounty. But assuming that she had discharged that notion, what must be inferred from her want of decision as thus evinced, and as evinced also by the readiness with which she assented to Waldeck’s suggestion?
Is it anything more than this: that she was a woman without much mental activity or much strength of purpose ?
But she must nevertheless be declared competent to direct the disposition of her estate, if, within the meaning of our Statute of Wills, she was possessed of “sound mind and memory”; mere weakness of mind does not amount to incapacity. (Horn v. Pullman,, 72 N. Y., 269; Cornwell v. Riker, 2 Dem., 364). “If a man be of mean understanding,” says Swinburne (Swim. Wills, Part 2, § 4), “ though he rather incline to the foolish sort, so that for his dull capacity he might worthily be termed grossum caput, such a one is not prohibited to make a testament.” I certainly cannot find the decedent intestable because of anything that was done or omitted by her in connection with the making and executing of her alleged will.
Nor does the testimony of the witnesses called in behalf of the contestants who told of certain eccentricities of conduct on the part of Mrs. Weil, long prior to the day with which we are here especially concerned, throw much doubt upon her competency, in view of other testimony tending strongly to show that on that day and at periods not far removed from it, she was in full possession of her mental faculties. There is really nothing in the evidence bearing upon the question of testamentary capacity •which lends much support to the claim of the contestants except the inaccuracy of a statement incorporated into one of the provisions of the will. “To my brother Meyer Oppenheimer,” that *367 paper says “ who has neve.r visited me during my sickness,” “ I give and bequeath the sum of five dollars in cash.” Now it is not true that Meyer made no visit to his sister while she was ill. It is impossible to ascertain from the testimony the number of his visits : there may have been as many as five or six, in the five or six months next prior to April, 1886. It is not clear that there were any more. The contestants insist that the decedent’s use of the language just quoted shows that her memory was so greatly impaired as to indicate a condition little short of imbecility, or that she was the victim of an insane delusion in respect to the conduct and character of her brother Meyer.
A careful review of the various interpretations of the language used by the decedent in her references to Meyer, (for it must be borne in mind that she spoke in German and had little understanding of English) and a consideration of the circumstances under which that language was uttered, have satisfied me that she did not intend it to be literally exact and accurate. It was the language of indignation and resentment occasioned by the infrequency of Meyer’s visits and by what she evidently regarded as his indifference and neglect. She was old and sick and infirm, living in cheap apartments in a tenement house, with no relative at hand and with nobody to minister to her wants from day to day except sympathizing neighbors and a hired nurse. If her brother Meyer exhibited any special interest in her or displayed towards her any special fraternal affection, it certainly is not disclosed by the evidence. It was not, therefore, as it seems to me, at all extraordinary that she should have characterized his seeming lack of attention in somewhat extravagant terms.
At page 3 of the stenographer’s minutes appears the following testimony of Ansbacher :
“ She said that she had a brother here in this city; that he never came near her during her sickness. She had been sick for two years, I' believe she stated, and he had never been near her.” — The same witness says at page 7, “ He ” (her brother) “ had not been near her during her sickness: I think about two years that he had forgotten her entirely, but to show that she had not forgotten him she would leave him five dollars.”
The subscribing witness Frank testifies at page 11: “ Mr. Waldeelt said, “ Have you not got any relations?” So she says, “ My relatives never come to . see me by life and they cannot see me when I have died.” Mr. Waldeelt asked particularly whether she had any relations here or in Europe, and she said those relations she had' got in Europe they can get nothing, and Mr. Oppenlieimer gets five dollars. Mrs. Weil says, “ This lady (referring to the legatee Mrs. Hoffman) “ shall get the rest of her money because she treated her like a mother. She comes here every day, morning and afternoon, and brings breakfast and dinner.”
*368 At page 13, Frank says : “Mr. waldeck asked Mrs. Weil, “ Have you any relatives here ? ” She said she had a brother here but didn’t - mention his name, and she said he will not get but five dollars because he did not come to see her — -in her sickness.”
Waldeck testifies at page 18: “I asked her if she had got any relations here. Yes, she had got a brother here, but she did not care about him because he did not come to look after her and he should have nothing.” Again at page 21: “ I asked her if she did not want to give her relations, her brother, anything,”. . . she said, ‘No, he can’t have nothing because he don’t care anything about me when I am sick.” Yet again at page 28 : “ She said she had a brother here, that he never cared for her and never visited her while she was sick and so she did not want to have anything to do with him and don’t want to leave him anything.”
Is it not far more reasonable to suppose, taking all this testimony together, that the decedent if she made use of any German word or phrase for 'which “ never ” is the English equivalent, was guilty of what upon inquiry she would have admitted to be an exaggeration, than to suppose that she had altogether forgotten the visits of her brother or was under such a delusion regarding him that she did not know that those visits- had ever taken place ?
Apart from the testimony of Mr. Waldeck and of the subscribing witnesses Frank and Ansbacher, Dr. Lilienthal, the physician who saw Mrs. Weil on the day before her death and “ pretty much every day ” for the two months preceding, says that “ her mind was perfectly clear.”
I have already declared that the account given by some of the witnesses of certain absurdities of speech and conduct on the part of the decedent were not calculated to create any serious doubt of her competency.
I cannot believe that her brother Meyer, if he was at all worthy of her affection, regard and testamentary recognition, (and he-claims that he was)would have suffered her, had there been any substantial grounds for believing her insane, to live for so many months alone, suffering from illness, and to all appearances suffering also from poverty. He would not have failed to procure for her the medical treatment, and the care, attention and nursing demanded by her unfortunate condition.
The testamentary capacity of the decedent has all in all been proved to my satisfaction.
There is no evidence in this case which would justify a finding that in making the paper here in dispute the decedent was subject to undue influence. It does not appear that any of the persons whom it names as beneficiaries were directly or indirectly instrumental in procuring it to be made and executed. *369 Nor does it appear that any of the persons concerned in its making and execution have the slightest interest in its dispositions. The decedent was subjected to no restraint and to no importu-nities. She evidently allowed herself to be controlled by the influences arising from gratitude and affection. Such influences do not vitiate a testamentary paper (Gardiner v. Gardiner, 34, N. Y. 155).
Counsel for the contestants claim that the failure of their adversaries to call Mrs. Hoffman to the stand is a circumstance that makes against the will. Had she been produced in her own behalf, she could not, within the limitations of § 829 of the Code of Civ. Proc. have testified to any personal transactions or communications between herself and the decedent; and it does not appear that aside from such transactions and communications there were any competent and material facts within her knowledge. The contestants saw fit to resort to their rights under § 2,618 by calling for the examination of the decedent’s nurse and washerwoman, to each of whom the will gives a small legacy. They could have similarly compelled the production of Mrs. Hoffman, but did not see fit to avail themselves of that privilege.
The contestants’ objections must be overruled and the will admitted to probate. Let a decree be entered accordingly.