*Will — testamentary capacity — undue influence — not inferred from opportunity and interest — when presumed — evidence — inequitable will.*

It is essential that a testator should have sufficient testamentary capacity to comprehend perfectly the condition of his property, his relation to the persons who were, should or might be the objects of his bounty, and the scope and bearing of the provisions of his will. He must have a sufficiently active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their obvious relations to each other, and to be able to form some rational judgment in relation to them. A testator who is able to do this is of sound mind and memory, and competent to dispose of his estate by will.

Upon a contest in regard to the admission to probate of an alleged will and codicil, dated respectively in May and August, 1884, evidence of the testator's physical and mental weakness subsequent to 1884 is entirely proper as bearing upon the impairment of his mind and body.

A finding that a testator had capacity to make a will is not inconsistent with the finding that the same was made under restraint or undue influence.

Undue influence must be exercised by coercion, imposition or fraud, and does not arise from gratitude, affection or esteem. It must overpower and subject the

will of the testator, producing a disposition of his property which he would not have made if left to act freely at his own pleasure.

The exertion of undue influence must be proved; not necessarily by direct proof, but it will not be inferred from opportunity and interest, although it may be inferred from circumstances which lead justly to the inference that undue influence was employed, and that the will did not express the real wishes of the testator.

There are certain cases in which the law presumes that undue influence has been used, namely, where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relationships exist. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required beside the will itself before it can be sustained.

It is a significant circumstance bearing upon the question of undue influence that the brother and legal adviser, who drew the testator's will, was, in case of the testator's intestacy, entitled to a share in the estate almost equal to what he received under the will, and that he was a beneficiary thereunder only to about the same extent as seven other persons, who, besides the testator's widow, shared in the estate.

Whether or not undue influence has been exerted in a given case is a question of fact.

If a testator was mentally competent to make a will, and a will made by him was his free act, the fact that the provisions of the will were inequitable and unjust furnishes no ground for disturbing it. Unreasonableness in disposing of his property is only a circumstance which may be considered with other circumstances appearing as bearing upon either the question of testamentary capacity or undue influence. The question in such cases is, was the will a free act of a competent testator.

The fact that a testator was weak and easily influenced, though a circumstance to be taken into consideration with other evidence, does not, in itself, raise the presumption that undue influence was exercised simply because his will was unsatisfactory to certain of his relatives, nor does the mere fact that the opportunity had been afforded of exercising undue influence, and that benefits had resulted to those who had such opportunity, raise a presumption that undue influence was exercised.

A change of testamentary intention, as bearing upon the allegation of undue influence in procuring a will, is sometimes an important circumstance, but its force depends mainly upon its connection with associated facts.

APPEAL by the contestants, Catherine H. Skaats and others, from a decree of the surrogate of the county of New York, entered in the office of the clerk of said Surrogate's Court on the 18th day of May, 1892, admitting to probate the alleged last will and testament of Schuyler Skaats, deceased.

Schuyler Skaats, the testator, was born at Geneva, N. Y., in 1818, married in 1866, and died in 1890, without issue, at the age of seventy-three. Some seven years before his death, and on May 22, 1884, he made his will, and on August 21, 1884, a codicil thereto. By the will and codicil the testator sought to dispose of the joint estate of himself and wife, which was worth in 1884, $558,475, of which amount $186,505.83 was left to the widow. Of this latter amount, $140,802.94 was admittedly the separate and individual property of the wife, which she owned at the time of her marriage, and which had been mingled with his own, thus making the value of the bequest to Mrs. Skaats $45,702.89. By the second paragraph of the will the testator stated it to be his intention to restore to his wife the entire amount of her separate and individual estate, and also to give her in addition thereto a reasonable part of his own property. The remainder of his property he divided among his surviving brothers and sisters and a son of his deceased brother Gideon, making no mention of the three contestants, children of another deceased brother.

The grounds of objection on which the contest is made are, that the deceased was of weak mind at the time of the execution of the will, and subject to the undue influence of his brother Bartholomew Skaats, and that the will itself was unreasonable and contrary to the admitted declarations of the testator.

*John M. Bowers,* for Catherine H. Skaats and others, appellants.

*David McClure,* for respondent, proponent.

*Thomas G. Shearman,* for respondents, legatees.

O'BRIEN, J.:

Upon the question of testamentary capacity the law is well settled, and in the leading case of *Delafield* v. *Parish* (25 N. Y. 9) is stated as follows:

"It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relation to the persons who were, or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to

collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the Statute of Wills, a person of sound mind and memory, and is competent to dispose of his estate by will."

Weeks, running into months, were consumed in eliciting facts bearing upon the question of the testamentary capacity of Schuyler Skaats, deceased. It would exceed the bounds of any opinion to collate from the three large volumes of testimony, all the details of the life of the deceased, partly brought out on behalf of the contestants, which it is claimed tend to establish mental weakness, and partly on behalf of the proponents to refute such theory. We must, therefore, content ourselves with grouping together the most salient features of the case and thence deduce our conclusions.

It appears that the testator had been a man of regular habits, and was a painstaking and marvelously accurate bookkeeper, and kept by his own hands, by a system of double entry, one of the most perfect sets of books that the experts had ever seen, which balanced year by year down to a penny, he having made the last balance January 1, 1883; that during 1883 he made the entries in the different books correctly, and continued to correctly enter his items down to April 30, 1884, and that in the fall of that year the accounts were kept in a more irregular manner, which irregularity gradually increased until his death.

The contestants also attached great weight to the diaries kept by the testator, commencing with January, 1884, and running to within two days of his death, which contain minute entries of his daily life, contestants especially relying upon numerous entries of calls of nature, and of his having taken doses of tonics, liver invigorators and purgative medicines, and of his symptoms in consequence and other trivial incidents.

Again, reference is made to photographs of the deceased introduced in evidence, taken at different periods of his life; one in 1878, one in 1886 and one in 1890, which certainly show that as years went by

he changed in appearance and became older looking, but which are of no assistance to us in determining whether or not in 1884 the testator was of weak mind.

It is further contended that weakness of mind is shown from the fact that in his latter years, beginning in 1883, the testator had occasional spells of unconsciousness, called by his wife " indigestible turns ; " that he would sometimes scream or shout apparently without cause ; that he had many odd manners and habits, such as making puns, reciting poetry in a showy manner, pasting pictures in books, shaking hands with hotel waiters, smoking in bed, wearing cap and gloves while eating, etc., etc.

As against all this, it is shown that he impressed people outside of his family as being somewhat eccentric to be sure, but neat in appearance, pleasant and cheerful, a good joker, well read, intelligent, a good judge of pictures, very shrewd in matters of business and hard at a bargain ; that many of his peculiarities were the habits of long years, such, for instance, as his punning propensities and conversing with waiters and shaking them by the hand, and that his diaries for the years 1843 and 1853, which were produced, contained entries substantially similar to those in the diary for 1884. His occasional screams would appear to be explained by the fact that he suffered from a bad rupture, which at times gave him great trouble, causing him to cry out with pain. Even his failure to keep up his books for the summer of 1883 may be sufficiently accounted for on another theory than failure of intellect. He had then passed his sixty-fifth year and had long been out of business ; his digestion was much impaired ; he was troubled and sometimes tortured with rupture, and he was constantly dosing with powerful medicines, which he sometimes took, under protest, to allay the anxiety of his wife, at whose suggestion also in the fall of 1883 he commenced the habit of driving out about ten o'clock in the morning for the benefit of his health. His diary shows further that in 1884 he and his wife generally drove out in the afternoon a second time, and that he was accustomed to take a short nap in the day-time. Under these circumstances it would be entirely natural in him to gradually give up the superfluous labor of keeping such an elaborate set of books.

But when it is made to appear that the testator, during the very years when he is alleged to have been imbecile, had the control and

management of a large amount of property, buying and selling bonds, and that he never made a bad investment, but that the market value of his securities had increased considerably at the time of his death; that he constantly watched the fluctuations in the values of his securities — the principal part of which fluctuated wildly during the years 1883, 1884 and 1885 — and frequently recorded the fact in his diary; these facts show such firmness and sound judgment as could not have been exercised by a man of feeble mind. Moreover, the person most intimately associated with him, Mrs. Skaats, the principal contestant, reposed the utmost confidence in his business sagacity, both before and after the making of the will, trusting him with the management of all her fortune, which he kept invested and from which she received a large income.

By reference to the dates it will be noticed that the more marked features of physical and mental weakness relied upon by contestants appeared subsequent to 1884, and while it was entirely proper as bearing upon the impairment of the testator's mind and body to admit such testimony, it must be remembered that the will was made in May, and the codicil in August, 1884, about seven years prior to testator's death, and that these are the important dates. It is conceivable that, by reason of physical and mental weakness, one might be deprived of testamentary capacity just prior and subsequent to a period when such capacity existed, and the question in all such cases necessarily must be as to the mental condition of the testator at the date when the will was made.

In regard to the period prior to 1884, although some evidence was presented bearing upon the nervous results to the testator growing out of the panic of 1873, it appears that his recovery was sufficiently marked to make this simply an episode in his life which did not permanently impair either his body or mind. So, that in January, 1883, the testator was concededly in sound mind, amply competent, not only to make a will, but to enter into any contract. About that time he was attacked with the first of a long series of what has already been alluded to as unconscious or "indigestible" turns, consisting of a short attack of unconsciousness, during which "he turned red in the face, became rigid and seemed gone." That these occurrences resulted from attacks of indigestion is made apparent, because from this trouble the testator suffered for many years,

which not only accounts for the amount of medicine he is shown to have taken during the latter years of his life, but to some degree may account for the watch that he kept upon his physical condition, resulting in the minute entries in his diary, some of them indelicate and disgusting, as to his physical needs and acts.

In August of that same year (1883) the testator had a serious fit of illness at Lake George, and testimony was adduced showing that while not suffering he was at times delirious, and that his mind was considerably disturbed. During this period he was unconscious of his surroundings, forgetful of his friends, occasionally violent and possessed of delusions, which were the result of a fevered and delirious mind. That he recovered, however, is equally certain, and though this attack may have had a marked effect upon him both mentally and physically, it did not take away from him that grasp of his affairs, or that ability to look after them, which had distinguished him throughout his life. The most that can be said is, that to some extent both mind and body may have been impaired, but his recovery left him in a condition in which he was able to understand his acts, and to produce the impression upon those outside of his family circle that he was entirely rational. Such a conclusion, moreover, is enforced, not only by the successful way in which he administered his own and his wife's estate, but by his conduct in the ordinary affairs of his daily life, including the preparation for and the final execution of the will.

Exclusive of the testator's own diary, the contestants furnish no evidence having specific reference to the month of May, 1884; while, on the other hand, it was shown by five witnesses who had interviews with him in that month, that they regarded him as of sound mind, and from the diary, accounting for each day in the month, the inference is fairly deducible that he was in sound mental and bodily health, and accustomed to walk and ride out, frequently alone.

We cannot upon this ground, therefore, agree with the contestants, that the evidence established a want of testamentary capacity; but, on the contrary, we think it is abundantly shown that he understood the nature of the act, and possessed a mental grasp greater and stronger than has been held sufficient in many of the cases that could be cited.

This brings us to a consideration of the second ground urged, which it is insisted by the appellants was entirely overlooked by the learned surrogate.

It is claimed here, as it is suggested it was claimed below, that although reliance was placed upon the fact that the want of testamentary capacity had been established, and that even though this were not supported, a case was presented wherein one in an enfeebled state of body and mind was unduly influenced by another.

As said by Redfield on the Law, etc., of Surrogates' Courts (4th ed.), 159: "The finding that the testator had capacity to make a will is not inconsistent with the finding that the same was made under restraint or undue influence. Undue influence must be an influence exercised by coercion, imposition or fraud, and not such as arises from gratitude, affection or esteem, and its exertion upon the very act must be proved. It will not be inferred from opportunity and interest. But the exercise of undue influence need not be shown by direct proof; it may be inferred from circumstances, though the circumstances must be such as to lead justly to the inference that undue influence was employed, and that the will did not express the real wishes of the testator."

As to the character of the evidence necessary to establish such a charge, and upon whom the burden is placed, the rule is thus given in *Marx* v. *McGlynn* (88 N. Y. 370):

"It is not sufficient, however, for the purpose of establishing undue influence, to show that the will is a result of affection or gratitude, or the persuasion which a friend or relative may legitimately use; but the influence must be such as to overpower and subject the will of the testator, thus producing a disposition of property which the testator would not have made if left freely to act his own pleasure, and this kind of influence will not generally be presumed, but must be proved like any other fact by him who alleges it. But there are certain cases in which the law indulges in the presumption that undue influence has been used, and those cases are where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relationships exist. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed

with great suspicion by the law, and some proof should be required beside the factum of the will before the will can be sustained."

Under well-settled principles of law, therefore, whether undue influence has or has not been exerted in a given case is a question of fact, and it becomes necessary here, as in every other instance where the claim is made, to weigh the testimony and determine therefrom the fact of the existence or non-existence of undue influence acting upon the testator.

Here the charge is made that the testator was controlled in the disposition of his property by his brother Bartholomew, and the evidence sustaining such charge is merely derived from Bartholomew's testimony. He tells the story of the making of the will and codicil, from which it appears that the testator first spoke to him about making the will on May 7, 1884, at the Buckingham Hotel, where he had called at the request of Mrs. Skaats upon another matter in which he was acting as counsel. The testator furnished him with memoranda of the different bequests he proposed to make, from which the next day Bartholomew prepared a draft of a will. On the ninth the testator called and took away the draft, and on the twelfth or thirteenth he called again and had a further consultation about the will, asking certain questions as to what would happen in the event of certain contingencies with reference to the specific legacies. The final changes were made in the will, after which it was engrossed and then carefully read over by the testator and his name signed at the end of every page, and on the twenty-second of May, in company with his brother, the testator took the will to the office of the Farmers' Loan and Trust Company and executed it. After it had been executed the testator received a copy, and Bartholomew kept a copy. With respect to the codicil, the testator had spoken to his brother about it at the Buckingham Hotel previous to going to Saratoga in June, 1884; and upon meeting him in Saratoga in August the testator spoke to him again about it, suggesting that the share of W. W. Skaats, who was insolvent, had better be put in trust. The testator prepared the codicil himself; suggestions were made as to its form by Bartholomew, and some alterations made in accordance therewith. Bartholomew never saw the codicil as it was finally executed, he having left Saratoga before the day of its execution.

His testimony is nowhere contradicted, but, on the contrary, is

confirmed by the diaries produced by the contestants after his story was told. By such direct evidence, derived from two independent sources, viz., the testimony of Bartholomew Skaats and the testator's diary, the one agreeing with and confirming the other, and neither being contradicted, and in the absence of evidence enabling any inference of undue influence to be indirectly drawn, the surrogate's opinion seems to be fully supported when he says: "I cannot find any evidence which, according to the well-settled rules of law, would authorize me to reject these papers upon the ground that they were obtained by an improper and undue influence exercised by anybody over the decedent. The evidence convinces me that both the will and codicil were prepared by him  * * * without any improper interference."

Upon the question of unreasonableness the claim of the contestants is, that as the will divided the greater portion of the estate among the testator's own brothers and sisters, and out of so large an estate made so small a provision for the widow, when, according to the testimony of the sisters of the widow, he had led them to believe her interest under the will would be much larger, such an unreasonable disposition of his property, regardless of the claims of his wife, and contrary to his expressed intentions, could only have been the result of ulterior and sinister influences exerted upon the testator's weak mind. On the contrary, we have reached the conclusion from our examination of the case that the testator was mentally competent to make a will, and that the will and codicil were his free acts. This being shown, the fact that the provisions of the will were inequitable and unjust would furnish no ground for disturbing it. But it is evident that from the testator's point of view no injustice or unfairness was intended. He had no children, his wife was a rich woman in her own right, with an income which he might have thought to be in excess of her real wants, while his own family were comparatively poor, and he was no doubt convinced that if he should leave them out of his own will their fortunes would be nothing improved by any legacies from Mrs. Skaats, who had relatives of her own to provide for.

It will thus be seen that any presumption that might arise from the fact that Bartholomew Skaats drew the will in which he was named as a beneficiary is not established by the other facts appear-

ing; that, in addition to being the attorney, he stood in the relation of a brother to the testator, and was thus entitled, in case of intestacy, to a share in that brother's estate almost equal to what he receives under the will. We regard it, therefore, as a significant circumstance bearing upon this question that the brother and legal adviser, who drew the will, was a beneficiary only to about the same extent as the other seven persons who, besides the widow, shared in the estate.

In *The Matter of Bedlow* (67 Hun, 412) it was said by the presiding justice, VAN BRUNT: "In the discussion of this question it is necessary that the court should consider the circumstances surrounding the testator at and about the time of the execution of the will, and subsequent thereto. It is urged that the testator was weak and easily influenced by those who surrounded him, which fact is a circumstance undoubtedly to be taken into consideration with the other evidence, but the mere fact that he was weak and easily influenced does not in itself raise the presumption that such influence was exercised simply because a will such as was satisfactory to the appellants had not been made by the testator. * * * And while it is undoubtedly true that it is always difficult to produce testimony showing undue influence over a testator, yet the mere fact that the opportunity of exercising undue influence has been afforded, and that benefits have resulted to those who had the opportunity of exercising such influence, by no means raises a presumption that such influence was exercised."

In this case, with the opportunity afforded, had testator's brother wished to exert an undue influence, as it was not exercised for his own particular advantage, we think the inference can be justly drawn either that he did not attempt it or that the testator was not amenable to such influence.

In disposing of the argument, based upon the unreasonableness of the will, but few words will suffice. As to the failure to provide for the three nieces who contest, the explanation is furnished by the testimony showing that the testator had little personal relations with them during his life, and never regarded them as objects of his bounty, and were it not for the failure to recognize the claim of the wife to a larger share in his estate, there would be no basis upon which to urge that the will was unreasonable, because it was in all

respects just such a will as it was most natural for the testator to make.

With respect to the wife, considering the part that she played in bringing a fortune to her husband, in the amassing of his own wealth, and the care and solicitude which she exhibited — which latter was so assiduous as to be at times the subject of a complaint even on the part of the testator himself — there would appear to be just cause for dissatisfaction upon her part because she did not receive more of her husband's estate; yet, on the other hand, the testator no doubt thought that the $140,000 which she owned in her own right, to which was added about $45,000 from his estate, was, considering her needs and childless condition, sufficient for her wants. As already said, however, unreasonableness in the disposition of a testator's property is not a ground for disturbing it, but only a circumstance which may be considered, with other circumstances, appearing as bearing upon either the question of testamentary capacity or undue influence. We do not understand that it is here urged upon the question of testamentary capacity, but is insisted that because the testator had stated at different times that it was his intention to make up his wife's fortune, together with what she herself possessed, to an amount equal to $250,000, that a failure to carry out this intention is indicative of the influence of some other mind in changing such intention.

As said in *Horn* v. *Pullman* (72 N. Y. 276): "A change of testamentary intention, as bearing upon the allegation of undue influence in procuring a will, is sometimes an important circumstance, but its force depends mainly upon its connection with associated facts. * * * A testator has a right to dispose of his estate in any way he may deem best. He is not required to make an equitable will, and he may, if he choose, exclude his children, or divide his estate among them unequally. The question in all such cases is, was the will a free act of a competent testator? The reasons for the change of intention in this case do not very satisfactorily appear."

So in the case at bar we may say that if the testator had any such intention, the reason for the change in his views does not satisfactorily appear, but giving such weight to that circumstance as it is entitled to, in connection with the other facts here appearing, we

think that the learned surrogate was right in his conclusion that at the time Mr. Skaats executed these two papers he was capable in law of making a will, and that "both the will and codicil were prepared by him, thought out by him, and executed by him without any improper interference."

The decree should be affirmed, with costs against the appellants.

FOLLETT and PARKER, JJ., concurred.

Decree affirmed, with costs against the appellants.