1. WILLS—SIGNATURE OF TESTATOR—ACKNOWLEDGMENT.
    Presentation of will by testator to the subscribing witnesses, with his signature in plain sight, stating that it is his will, and requesting them to sign it, is a sufficient acknowledgment of the signature.
2. SAME—UNJUST WILL.
    The mere fact that a will is unjust and unreasonable does not affect its validity.
3. SAME—MISTAKEN BELIEF OF TESTATOR.
    A mistaken belief of testator in respect to a person's character is not insanity, and will not avoid the will.
4. SAME—ALTERATIONS.
    Where it appears that the amount of a legacy, as originally written, has been altered, it will be presumed that the alteration was made after the execution of the will, and therefore such alteration is inoperative, and the legatee will take the original amount.
5. SAME—LAW OF LEGATEE'S DOMICILE.
    The law of a legatee's domicile controls as to the validity of the bequest.

Probate of the will of Louis Lang, deceased.

Chambers & Boughton, for proponents.

W. C. Morris (Douglas E. Levien, of counsel), for contestants.

FITZGERALD, S.   The subscribing witnesses, Frederick H. Steinbrenner and Charles A. Appleton, testify to the facts essential to a due execution of a will.   The paper is in the handwriting of the decedent, and was brought by him to the office of D. Appleton & Co., with which house the witnesses were connected; was presented to them with a statement that it was his will, and the request that they sign it.   He did not, in their presence, sign the paper; nor did he, in express terms, acknowledge his signature.   But its presentation to them with his signature in plain sight, as testified to by them, was a substantial acknowledgment.   In re Phillips, 98 N. Y. 267.

Objections were filed in behalf of decedent's brother, Johann Nepomuck Lang, alleging that the execution was not a voluntary act of the decedent, and that he was not of sound mind and memory. No evidence of undue influence was produced.   The only issue to be determined by me is the question of mental capacity, except that which arises on the validity of the instrument which is called in question on other grounds, and which I will hereafter consider. Louis Lang was by birth a German, and was unmarried.   He was an artist, and had resided for nearly 50 years in New York.   By thrift he had accumulated a competence more than sufficient to supply his wants.   His surplus moneys he deposited with Messrs. Appleton & Co., with some of the members of which house he was on terms of intimacy.   Against the account he drew checks.   Under the advice of Mr. William W. Appleton, he made investments, and the securities were left with the firm for safe-keeping.   He was a member of the Artists' Fund Society and of the Century Club.   In later years, by reason of increasing infirmities, he visited the club with less frequency.   He became untidy in personal ·appearance, and his memory was somewhat impaired,—a condition not uncommon in aged people,—and at the age of 81 he died.   A competent testator, free from undue influence, may make whatever disposition of his property by will that he chooses, though unjust and unreasonable.   He may divert his estate from those who would be regarded as having a natural claim upon his testamentary consideration, and give it to strangers.   If capacity and formal execution and volition appear, the will must stand.   Seguine v. Seguine, 4 Abb. Dec. 191. As concisely stated by Rollins, S., the question of capacity is whether a decedent is capable of sufficient thought, reflection, and judgment to know of the property he has, and to decide and declare what shall be done with it.   Cornwell v. Riker, 2 Dem. Sur. 354. And an unjust belief by a testatrix that her brother, the contestant of her will, had obtained more than a fair share of the property left by their father, to her detriment, and which caused her to have an intense dislike for the brother, was a mistake in judgment, and was no ground for rejecting her will.   In re Bull, 6 Dem. Sur. 123.

Even a monomaniac may make a valid will, if the delusion has no relation to the subject or object of the will, or the persons who would be likely, ordinarily, to be the recipients of his bounty, where the provisions of the will are entirely unconnected with or uninfluenced by the particular delusion. Lathrop v. Board, 67 Barb. 590. Nor is a lack of testamentary capacity to be assumed from the fact that one is far advanced in years. Horn v. Pullman, 72 N. Y. 269. In the light of these principles, I will consider the case on the evidence produced.

In 1889 or 1890 (the date I will consider hereafter), Louis Lang himself wrote the paper now under consideration as his will. He also wrote another in the German language, purporting to be a will, and which, in the paper itself, he claimed expressed the meaning of the one in English. He was conscious that he was near the end of life. He stated to Mr. Roelker, whom he named as one of the executors, that his bonds and valuables were in a tin box in the possession of Mr. Appleton. In the box were also found the will and the German copy. He explained to Roelker some of the provisions of the instrument, and gave him instructions, stating that his death might occur at any time. He told him where, in his apartment, other important papers were, that he might readily find them. He further stated to Mr. Roelker that Mr. Cunningham would attend to the details of his funeral. On a sheet of note paper, with the caption, "Last memoranda of Louis Lang to Patrick Cunningham," whom he addresses as his friend, he gives instructions in respect to the disposition of his remains, and to provide an inexpensive headstone for his grave; and he designates Mr. William W. Appleton as his first, and Mr. John L. Fitch his second, executor. On a similar sheet, dated September 12, 1891, he makes the same request, and asks Cunningham to see Mr. Fitch, his "second executor," who will send documents referring to his will to his native town, and will sell his pictures and other things in his room at auction for the benefit of the poor artists' widows. On October 17, 1892, he wrote to Mr. George H. Yewell, as "secretary of the Art Fund," stating that he had made his will, and in it made a disposition of everything in his apartments to be collected and prepared to be sold after his death for the benefit of the "artists' widows of the Art Fund established in the city of New York." On December 5, 1892, he wrote to Mr. Alfred Roelker a letter, in which he referred to his important papers, and the necessity for Mr. Roelker to see where they were. Besides these documentary proofs, is the testimony of Mr. George H. Story and Mr. Yewell, who called on Lang in 1892,—long after his will was executed,—and of Messrs. Augustine Smith and Thomas W. Wood, who had had a long acquaintance with him, which continued to near the period of his death. From their testimony and that of Mr. Roelker, there can be no doubt of the mental competency of the decedent.

Against this evidence are facts which appear upon the face of the will and other papers produced, showing a tendency to decay of memory and of mental power. In the will, as in the two letters

written to Cunningham, he refers to Mr. Fitch as one of his "executors," to whom he had intrusted the collection and disposal of his pictures for the benevolent fund of the Artists' Fund Society, though further on in the same instrument he states that William W. Appleton and George H. Roelker had volunteered to be his executors. But "George H." is stricken out with the pen, and above, in red ink, is written the word "Alfred," but leaving on the next line "George H.," as part of Mr. Roelker's name, with a statement that he is to conduct the correspondence in German. On the fifth page he again writes the name "George H. Roelker." The residence of Mr. Roelker he states to be "202, 45 West street," instead of 202 West Forty-Fifth street, where it is, and has been for many years. No such person as George H. Roelker is known to Alfred Roelker. Besides, no one of that name resided in his house. The name of the society to be benefited by the proceeds of the sale of his effects is differently expressed, as the "Artists' Fund Society" and the "Benevolent Artists' Widows' Fund," and the "Benevolent Fund." Interjected in the will, at the foot of the first page, in the paragraph giving instructions for the disposition of his effects, is written, "Jewels I have none;" and after the signatures of the subscribing witnesses, at the end of the attestation clause, he has written the words, "I am not a Chatolic Louis Lang,"—doubtless a misspelling of the word "Catholic," though it is in proof that he was reared in the Catholic faith. The date appears in the clause at the foot of the instrument as the 8th day of May, 1889; and immediately below, and above the signature, in Lang's handwriting, is written "May 8th, 1890." There is also an indorsement, written by himself, which reads, "Louis Lang's last Will and Testament. Original in English, May 8th, 1890." There is in the paper a profusion of exclamation points, which is also a feature in his letter. A portion of the will is written in the language of the law, as if drafted by an attorney. Other parts are colloquial in style, the words being such as a layman would be apt to use in the expression of his ideas. A direction to the executors to collect from the treasurer of the Artists' Fund his accrued interest of $4,000, and add to it his assets, is crossed out in red ink, and opposite is written, "The amount has been paid pro rata to the members."

These anomalies, on careful examination, are accounted for. Some must have been the result of a failing memory, incident to old age. The fact of two different years—1889 and 1890—being assigned to May 8th, as the date of the will, is explained by a paper introduced in evidence, purporting to be a codicil, signed by the decedent, and attested by the same witnesses, Steinbrenner and Appleton. This codicil is of a formal character, not in the handwriting of Lang, but evidently prepared by an attorney, probably Mr. Elial F. Hall, for many years a well-known lawyer practicing in this city, whose name appears in the indorsement. In the first clause it is stated to be a codicil to a will executed March 4, 1889, several weeks before the date of the will, conceding it to have been executed in 1889. The true dates of the two papers are important to be considered, as bearing upon the question of the decedent's

mental competency. The memories of the subscribing witnesses do not agree as to the order in which they were signed. Mr. Steinbrenner's recollection is that the will was the first executed. Mr. Appleton is confident that it was the codicil. They do both agree that there was a year between the two events. From the intrinsic evidence afforded by the papers themselves, I am satisfied that Mr. Appleton's memory is correct, and that the date, May 8, 1889, which occurs twice in the codicil,—once in the witness clause, and again written by the decedent himself above his signature,—was when he copied the language of the codicil mechanically into the witness clause of the will, below which, and above his signature, he wrote the correct date, May 8, 1890. As the codicil repeats and confirms the first seven sections of the will of March 4, 1889 (which paper has not been found), and cancels the residue, and substitutes provisions which, with marginal notes, were carried into the contested paper, no other conclusion can be reached but that the codicil was a codicil to a will of March 4, 1889, and not to the paper under consideration. The language on the second page of the contested paper, in which he speaks of Mr. Fitch as his second executor, was doubtless, without consideration, copied from the will of March 4, 1889, unmindful of the fact that he had determined to substitute Mr. Roelker, whom he named on the third page, though he gave his name inaccurately. The claim that there was such a general impairment of mind as to suggest incompetency to make a will must be dismissed. It was only his memory that was at fault, but his mistakes did not obscure his testamentary intentions. They are apparent on a casual reading of the paper, and must determine the disposition of the property, unless the will was the result of an insane delusion. The existence of such a delusion is claimed, but not in respect to his brother, the contestant, for to him he bequeathed 2,000 marks, to enable him to pay his debts; nor to his brother's daughter, for he provides for her, in the trust created by the paper, a life interest in 50,000 marks; nor in respect to his brother's son Henry, whom he gives 2,000, if not 5,000, marks, to be paid in annual installments of 250 marks each; nor yet to the children of another niece, the first wife of Salzman, to each of whom he bequeathed 1,000 marks. The delusion is claimed to be in respect to the contestant's son Hubert, who receives nothing in the will, and would receive nothing had Louis Lang died intestate. There is no declaration in the will or elsewhere that the passing of Hubert Lang without testamentary recognition was due, as is claimed, to a belief by the decedent that he had been robbed by Hubert, or that Hubert was a robber. There does not appear to have been any good reason for suspicion on the part of the decedent in respect to Hubert. At most, it seems to have been a mistaken belief on his part in respect to Hubert's character; but such belief is not insanity, and cannot avoid a will deliberately prepared and properly executed. See Clapp v. Fullerton, 34 N. Y. 197.

Certain erasures and alterations which appear on the face of the paper are claimed by the contestant to have worked its revocation. The striking out of the "George H.," as the Christian name of Mr.

Roelker, and the writing in of "Alfred," I have referred to. That change does not obscure the intention of the testator. It makes it certain. But he has changed the amount of a bequest to his nephew Heinrich Lang for 5,000 marks to 2,000 marks in the eleventh clause of the fifth page. This is manifest from the fact that the 5,000 marks expressed in figures is left, followed by the words "two thousand marks,"—the "two" being manifestly written over an erasure,—and further down in the same paragraph the word "two" is again written over an erasure, followed by the words "thousand marks." These alterations, from their character, justify the presumption that they were made after the execution of the will. Such alterations will not invalidate the instrument, if the original intention of the testator can be ascertained. In this case the 5,000 in figures make it certain that it was "five" that was erased, and "two" written over the erasure. This question was fully examined by Rollins, S., in Wetmore v. Carryl, 5 Redf. 544, which case is in some respects analogous to the one under consideration. In the will there, as it was originally written, was a bequest to each of two granddaughters of "five thousand dollars." On inspection it appeared that the word "five" had been altered to "two." There being no attestation of the alteration, and neither witness having observed it at the time of execution, the surrogate held, upon a full examination of the authorities, that the alterations must be deemed to have been made after execution, and consequently inoperative. Under the rule thus laid down, the bequest to Heinrich Lang of 5,000 marks, as originally written, must stand.

The only question remaining is whether the will is invalid upon other grounds set forth in the objections.

Little or no stress is laid by the counsel for the contestants on the question as to the identity of the legatee provided for in the second and third clauses of the will. The legacy is claimed by the Artists' Fund Society of the City of New York. The rule of law in this respect is concisely stated in St. Luke's Home v. Association for Indigent Females, 52 N. Y. 191:

"A bequest would not be held void for uncertainty as to the legatee, except when it is found impossible, either from the words used alone, or in connection with such extrinsic evidence as would be competent to determine with reasonable certainty the person or corporation intended. It is well settled that an imperfect or inaccurate description of a person, natural or corporate, will not defeat a gift or grant."

The evidence adduced in support of the claim of the Artists' Fund Society seems to establish beyond any reasonable doubt that the claimant was intended by the testator to receive the legacy.

The sole question remaining for the court to determine is as to the capacity of the Council of Charitable Foundations, in the city of Waldsee, kingdom of Würtemberg, Germany, to take the residuary legacy. The law of the legatee's domicile controls as to the validity of the bequest, and the courts of this state will recognize a bequest which, if made to a legatee here, would be illegal, as valid when given to a legatee entitled to take under the laws of his domicile. Beck's Estate, Surr. Dec. (1892) p. 16; Chamberlain v.

Chamberlain, 43 N. Y. 432; In re Huss, 126 N. Y. 537, 27 N. E. 784; Hope v. Brewer, 136 N. Y. 126–139, 32 N. E. 558. The evidence adduced on the trial as to the laws of the domicile of the intended legatee, and of its ability thereunder to take by bequest, satisfies me that the legacy in question is valid. Submit decree.