---

(55 Misc. Rep. 487.)

### In re ARMSTRONG'S WILL.

#### (Surrogate's Court, Oneida County. July, 1907.)

WILLS—COMPETENCY OF TESTATOR—EVIDENCE.

> Testator, an old man, left as his next of kin one nephew and seven nieces, and devised his entire property to the nephew and one of the nieces. The will showed a knowledge on the part of the testator as to his affairs. *Held*, that he should not be adjudged devoid of testamentary capacity because of some peculiarities in conduct or on the opinion of a doctor, who is not a medical expert and who had never examined nor treated him, nor on that of witnesses based on the facts not justifying their conclusions that he was irrational, where he was thought rational by many witnesses who had no interest in the result of the proceedings.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 137, 147, 159.]

In the matter of the last will of Alden Armstrong. Probate decreed.

L. M. Martin, for proponents.

S. A. Miller and W. E. Burdick, for contestant.

Timothy Curtin, special guardian.

SEXTON, S. The deceased left a will, dated January 19, 1904, and died October 19, 1906, at the age of 92 years, leaving no widow or

children. His nearest relatives were seven nieces and one nephew. He left his property, valued at about $900, equally to his niece, Betsy Kimball, with whom he lived from 1902 to the time of his death, and his nephew, Amos P. Armstrong, who helped him in his business matters for a time prior to 1902. Probate was objected to by a niece, Cornelia Burdick, alleging testamentary incapacity, undue influence, and that testator was under the effect of a powerful narcotic when he signed the will.

Two of contestant's witnesses, husband and wife, lived in a separate part of the house with deceased for about two years prior to 1902, and testified that he was irrational, based upon a mixed state of facts descriptive of his life and conduct, which failed to establish the conclusion reached by the witnesses. They testified that deceased lived alone and had no help, bought his groceries, cooked his meals, set his table, washed the dishes, planted his land in the regular way, harvested the crops at the proper time, went to church, sometimes alone, on foot, a mile away, and returned at the usual time, spoke to every one who spoke to him, retired at 8 p. m. unaided, and arose about 7 a. m. Irrationality is claimed because he hurt his head, and he said some one came to his bed to rob him, talked to himself, sung hymns before retiring, read a great deal—often old matter. Witness Beswick saw him in 1903 at Mrs. Kimball's and sat at the table with him. He ate same as others; retired without aid; never had any talk with him. "On account of his repeating the same hymns, and, when it was time to go to bed, to have to be told," witness pronounced him irrational. Witness Keys said:

"I base my idea, his being irrational, on the fact of his being a somewhat childish old man."

The evidence of the doctor for the contestant, it is urged, is such as would warrant the denial of probate. This witness on cross-examination reverses himself many times, and, when tested, showed very poor memory. It appears that deceased had erected a headstone on his lot in the cemetery, which he frequented, and spent some time around his lot and in reading inscriptions. In August, 1903, the deceased entered the cemetery and—

"stopped at the first gravestone and commenced to read, and he stood there a minute or two and then went to the next, and continued on. Q. Did he speak out loud? A. Yes, sir. Q. What did he say? A. I can't tell; but it was nothing on the stone. I could hear what he said. Q. Was it the same as on the gravestone? A. No, sir."

On cross-examination the following appeared:

"Q. You couldn't read, from where you were, what was on the monument? A. No, sir; I couldn't understand what he said. I read what was on the monument. By the Court: Q. How do you know but that he was saying what was on the monument? A. Well, it was a jumbled-up mess. What I meant was, I couldn't remember what was said. I do not now know a single word that was on that monument, and do not remember a single word that he said. * * * He impressed me as irrational. His condition was senile dementia. I never attended him professionally, and base my conclusions on casual observations of him on the street and at times when there attending another patient. I don't know as he was ever sick. I never examined him as to his condition, and I am not an expert on mental disorders. To determine

whether a condition is due to old age or senile dementia would require a careful diagnosis of the case."

When evidence of this character is given by a professional man and urged as ground for the nullification of so solemn a document as a will, the mantle of charity should not be used by the court and the subject passed in silence. Any doctor who will swear in one breath that a man is irrational, in the next that he is afflicted with senile dementia and that his condition, whether from old age or senile dementia, can only be determined after a careful diagnosis for that purpose, and that he never examined him or treated him professionally, is dangerously close to the line of perjury, as on his own evidence he did not know his condition.

The contestant furnished evidence by one witness that deceased did not take very good care of his person for one of his years, by two witnesses that he was dirty, and by five witnesses that he was irrational. No delusions were shown, or insanity in the family, or restraint exercised, or interference of any kind with the conduct or movements of the deceased, from 1902, when he went to Kimball's to the time of his death.

On behalf of the proponent, the 2 subscribing witnesses, one an attorney and the other a business man, each of whom had known the deceased for at least 8 years, and 11 other disinterested witnesses, including 2 clergymen where deceased attended church; also Dr. Dudley who had talked with deceased seven or eight times during 1903 and the summer of 1904, and the postmaster, who had seen him almost daily after the mail for about 4 years before his death and had paid him money and taken his receipt; also a witness who had known him 47 years and met him three or four times a week since 1902, and was always recognized by deceased; also a witness 74 years of age who, in August, 1904, found deceased alone at the Kimball home and paid him $25, which he counted and put on a shelf, and afterward requested that it be left with the depot agent, as he had been robbed once and didn't want to take it, and went to the cemetery with him and had a long visit—in all, 15 witnesses, without any financial interest in the result, testified that deceased was rational.

It also appeared that contestant, Cornelia Burdick, got $2,000 "out of him," and she admitted having had $700, which she never returned, on which she paid deceased no interest. It appears that Amos P. Armstrong, one of the beneficiaries, had befriended the deceased for years, and that deceased had told different people how much pleased he was with his home at Mrs. Kimball's, the other beneficiary, and how well he was cared for.

Upon this evidence there is a question of fact for the court, in the determination of which the will itself can and should be considered. On its face the will shows an intelligent grasp, on the part of the testator, of his affairs. He directs the payment of his debts, and then gives his small estate, amounting to about $900, to his nephew and his niece equally; they being the only relatives, upon the evidence, that had taken any special interest in him in his declining years. This was equitable, and evidently believed to be so by seven of his eight

nieces, not benefited, several of whom lived near him and did not join in the contest. Upon these facts did the testator have testamentary capacity when he made his will? The rule long followed in this state as to testamentary capacity is as follows:

"Testator must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do those things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will." Delafield v. Parish, 25 N. Y. 9.

Incapacity cannot be inferred from an "enfeebled condition of mind or body." Horn v. Pullman, 72 N. Y. 269.

"Old people must, or at least may, be permitted to make wills, and the fact that they have lost much of the mental vigor of their earlier days does not prove or tend to prove that their testamentary acts are invalid." Hagan v. Sone, 174 N. Y. 321, 66 N. E. 974.

The notion prevails among many people that a will can be set aside when all the relatives are not, to some extent, benefited by it. "A man's testamentary disposition of his property is not invalidated because its provisions are unequal, or unjust, or the result of passion, or of other unworthy or unjustifiable sentiments. It is natural, and, therefore, usual, to make provision for a child; but, under our governmental institutions, no obligation to do so is imposed upon the parent, and the presumption of validity is not affected by the failure to do so, alone. Nor is the presumption in favor of a will overcome by showing that the testator was of advanced age or of enfeebled condition of mind or body." Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302.

The evidence, as I read it, does not go to the length of establishing that the testator did not comprehend the extent and value of his property and have in mind those most deserving of his bounty when he made his will, or that he did not, on January 19, 1904, the date of his will, have the mental capacity to make an intelligent disposition of his property; nor does it appear that he was drugged, restrained, unduly influenced, or even sick at the time he made his will, or that he was ever attended by a physician. "The fact that a man is upon his deathbed when he executes a will is, of course, no argument against its validity. The same clearness of comprehension and ability of expression which is required to enable a man to enter into a contract need not exist to enable him to make a valid will." Matter of Seagrist's Will, 1 App. Div. 620, 37 N. Y. Supp. 500.

Some evidence was given that the testator was filthy about his person, eccentric, often talked of his schooldays and his experiences as a teacher, frequented the cemetery and read the inscriptions on the stones, read the Bible a great deal, talked to himself, recited verses of poetry, hated tobacco, in a store sang a song condemnatory of tobacco habit, and claimed that some one attempted to rob him when he lived alone. But not one word of evidence is given in contradiction of the testimony of the two subscribing witnesses as to testator's condition at the time he made the will. Concede all the foregoing facts to be

true, and no such mental condition is shown, in view of all the other evidence in the case, at the time the testator was engaged in the business of making his will, that would justify a denial of probate.

In Ivison v. Ivison, 80 App. Div. 599, 80 N. Y. Supp. 1011, a man 80 years of age made a will which was admitted to probate after contest. He left no widow or children, and an action to test the validity of the will was brought by one of the nephews, and judgment for the defendants was entered, sustaining the will. In the case at bar it is urged upon the court that the alleged eccentricities, testified to by witnesses for contestant, are sufficient to support a finding of testamentary incapacity. In the Ivison Case, above referred to, it was shown by the contestant that the testator was supremely fond of money; that he would at times take his bonds or other securities and spread them upon the floor, and then, taking up one of them, would kiss it and call it his God; at times, when he had several thousands of dollars to invest, he would express fear of becoming an object of charity; that he disliked persons who rode a bicycle; that he hated poor people, and once threatened to strike a person asking alms, and at another time put one out of a room where he happened to be; that, on an occasion when he was being shaved, he got out of the chair, with his face partially covered with lather, for the purpose of driving an organ grinder away; that, when his wife died, which was a few months before his own death, he showed excessive grief, and at times thereafter said he saw her in the air looking like an angel; that he threw kisses at her, and signified a desire to die so that he might be with her; that prior to her death they frequently quarreled, he insisting that she should buy her summer hats in the fall and her winter hats in the spring, because she could then buy them cheaper; and that, after her death and before her burial, he tried to sell her sealskin coat. Upon these and other facts the court, in its opinion, says:

"The general effect of the plaintiff's testimony is simply that the testator was miserly, eccentric, and irrational upon some subjects; but there is an entire absence of evidence that he did not know what property he had, who were the natural objects of his bounty, or that he did not fully understand what he was doing when he made his will."

The court also held that:

"The answer of the medical expert to the hypothetical question that the testator did not have testamentary capacity was not of itself sufficient to justify a finding that at the time the will was executed the testator did not know what he was doing."

From the cases upon the subject of testamentary capacity, it seems clear that evidence, no matter what its character, which does not deal with the mental condition of the testator at the time of the testamentary act, is of little value.

Undue influence, because of the close relation of the deceased with the beneficiaries, and opportunity for same, is urged as a ground, upon the evidence, for denying probate. While the question of competency is closely connected with the issue of undue influence, still there is a distinction, as the allegation of undue influence would seem to imply competency. Whether undue influence was exerted is a

question of fact, and the nature of the proof is generally circumstantial, and must be such as to lead justly to the inference that undue influence existed. Rollwagen v. Rollwagen, 63 N. Y. 504; Brick v. Brick, 66 N. Y. 144.

Mr. L. M. Martin, one of the witnesses to the will and the attorney who drew it, was told by Amos Armstrong that he was wanted at the house on some business. He went in the forenoon and found deceased in good health, who told him what he wanted. While the will was being drawn, no one was in the room but the attorney and testator. The will was read over to him, and he said it was the way he wanted it. The attorney and testator visited about half an hour before the will was drawn. When it was signed, the testator and the two sub-scribing witnesses were the only ones present. Testator was a fairly well educated man and practically a stranger to the attorney. There is no evidence of any word or act on the part of any one designed to, or which did, in the slightest degree influence the testator in the disposition of his property. "It is not sufficient, to establish that a will was obtained by undue influence, that the person accused of practicing it had an opportunity so to do, because the fact that such an opportunity existed does not raise the presumption that advantage was taken of it." Matter of Spratt's Will, 4 App. Div. 5, 38 N. Y. Supp. 329; Matter of Bedlow, 67 Hun, 408, 22 N. Y. Supp. 290; Cudney v. Cudney, 68 N. Y. 148. "Those persons who occupy intimate and affectionate relations with any individual have the right, by personal request, by fair argument, and even by decent importunities, to procure a will to be made. The fact that they have done so is no argument against the validity of the paper, provided these importunities do not proceed so far as to overpower the will of the testator and induce him to do the thing which he would not have done but for these importunities, and to substitute the will of the beneficiaries in the place of his own uncontrolled judgment." Matter of Seagrist, 1 App. Div. 616, 619, 37 N. Y. Supp. 496, 499.

The testator lived nearly three years after making his will, and was in good health and physically able to walk around in the village of Deansboro at the time he made his will. Upon the evidence all of the presumptions are against undue influence, and the burden cast on one alleging it was not sustained. "The person who alleges that the will was obtained in that way is bound to prove, not only that there was an opportunity to exercise undue influence, but that it was actually exerted, and that the effect of it was to overpower the will of the testator and procure him to make a disposition of his property other than that which he would have made if no influence was exerted, and which he would not have made if no such influence had been practiced upon him." Matter of Spratt's Will, 4 App. Div. 5, 38 N. Y. Supp. 333.

Upon the hearing there was no dispute as to what occurred at the time the will was made; and there is no doubt but that the story of what took place at the execution of the will, by proponents' witnesses, is substantially correct, and shows a compliance with all of the statutory and formal requirements essential in the due execution of a will. "Wills are not to be set aside by juries, except for the gravest reasons.

A person has a right to dispose of his property in such a way and to such persons as he thinks best. It is only in a case where there is substantial proof of mental incapacity or undue influence that courts or juries may annul the testamentary act." Hagan v. Sone, 174 N. Y. 323, 66 N. E. 975.

Objections overruled and will admitted to probate. Findings and decree may be prepared accordingly.

Probate decreed.