In the Matter of Proving the Last Will and Testament of MAR-GARET OPHELIA GARDINER, Deceased.

Surrogate's Court, Schoharie County, March 12, 1928.

**Wills — probate — proof shows instrument propounded as last will to be genuine and duly executed — testatrix was competent to make will — evidence — it is common knowledge that one may recover from " shock."**

The instrument propounded as the last will of decedent should be admitted to probate where the proof not only shows it to be genuine, valid and to have been duly and legally executed, but also that at the time of its execution testatrix, over sixty years of age, was competent to make a will and was not under restraint.

It is common knowledge that people who have had a " shock " recover from it and go about their ordinary work one or two months after the occurrence.

PROCEEDING for probate of will.

*Alberti Baker,* for proponent and Louis Atzroth.

*Lyman S. Holmes* and *W. H. Sidney,* for special guardian.

BEEKMAN, S. The special guardian filed objections to probate on grounds that the alleged will was not the last will and testament of the deceased, that it was not duly executed, that testatrix was not mentally capable of executing a will, and that the execution of the instrument and the subscription and publication thereof was obtained by fraud and undue influence.

The petition for probate alleges that the value of the real estate

of deceased does not exceed $2,000, and that the value of the personal estate does not exceed $1,000. The petition further shows that the testatrix left over seventy cousins in some degree, residing in eleven different States. The testatrix left no husband and from her being referred to by counsel as Miss Gardiner, I conclude she never was married.

The sole beneficiary named in the will was Louis Atzroth, whose wife is a cousin in some degree of the testatrix.

Mrs. Thomas, one of the subscribing witnesses, swears that Miss Gardiner spoke to Mr. Thomas, her husband, about making a will several times during a period of about two years before the will was executed, and "that she said " there was a little trouble in the family; she asked Mr. Thomas how to make a will — how to go at it," and " that he [Mr. Thomas] found out more about it."

Mr. Thomas, another subscribing witness, states that Miss Gardiner had been " after him to make a will for her for two years," and he finally assented to do so. He had never drawn a will before and obtained a form out of a book and prepared the form and got advice from a lawyer and submitted the form to the lawyer who told him it was all right. In preparing the typewritten form, he left blank spaces for names and dates, as will hereafter appear. Mr. Thomas testifies that every time he saw the testatrix she would talk about the will she wanted drawn in favor of Louis Atzroth because he was good and kind to her.

On June 18, 1921, Mr. Thomas, Mrs. Thomas and Mr. Pearson went to the residence of the testatrix, Mr. Thomas having previously told Mr. Pearson that he was to attend to the execution of a will by Miss Gardiner.

The will reads as follows:

" I, MARGARET OPHELIA GARDINER do make my will as follows: All my estate I devise and bequeath to LOUIS ATZROTH for his own use and benefit forever, and hereby appoint him my executor, without bonds, with full powers to sell, mortgage, lease, or in any other manner to dispose of the whole or any part of my estate.

" Dated   JUNE 18   19   21

                " MARGARET OPHELIA GARDINER   [SEAL]

" Subscribed, sealed, published, and declared by MARGARET OPHELIA GARDINER testator above named, as and for her last will, in presence of each of us, who, at her request, in her presence, in presence of each other, at the same time, have hereto subscribed our names as witnesses.

this 18 DAY OF JUNE 1921

at the town of SCHOHARIE AND THE COUNTY OF SCHOHARIE."

Then follow the names and addresses of the three witnesses.

The names and words in capitals and all the figures except the first " 19," according to the testimony, were filled in by the testatrix, in her own handwriting, in the presence of the witnesses before they signed as witnesses, they writing their names and post-office addresses. The testimony shows that without doubt the will was executed according to the statutory requirements.

Witness Pearson was by occupation cable inspector for the General Electric Company at Schenectady, and previously for eleven years was in construction work with the Acme Engineering and Construction Company.

Witness C. A. Thomas' occupation for the past ten years has been custom tailoring in connection with running a gents' furnishing store at Schenectady, and witness Olive A. Thomas is the wife of C. A. Thomas and a sister of Louis Atzroth. Neither of them had ever been witnesses to a will before the execution of the will in question. There is no testimony reflecting upon the character of the subscribing witnesses. There were trifling variations in their testimony, such as would naturally occur in detailing circumstances which happened five or six years ago, and such as frequently occur in probate cases where subscribing witnesses who are not lawyers attempt to detail the circumstances attending the execution of the will, without anticipation that years afterwards they may be questioned about every minute detail.

The contestant argues that it was suspicious that a lawyer was not called in to draw or superintend the execution of the instrument. Any one who has had experience in the Surrogate's Court knows that people who have not been engaged in business or have led secluded lives or have only a small amount of property, prefer to call upon friends or relatives without any legal experience, rather than lawyers, to prepare their wills. It is the notion of many people that the drawing of a will is a simple matter, providing the draftsman is intelligent enough to express the testator's meaning. Having only her little dwelling house and only a small amount of personal property, it is probable that the testatrix desired to avoid the payment of money to a lawyer.

When the testatrix asked Mr. Thomas to prepare her will upon the numerous visits of himself and wife, he as a man of some education, had enough prudence to consult a lawyer as to the form which he had seen in a book before undertaking to do a piece of business with which he was unfamiliar, and testimony disclosed that the language and meaning of the attestation clause were literally followed by the testatrix and the subscribing witnesses. The three witnesses agree that the testatrix and each one of them

Misc. 874]    Surrogate's Court, Schoharie County, March, 1928.

read the will and the attestation clause aloud before the testatrix signed her name; and that the testatrix wrote the words capitalized in the above copy.

The internal construction of this will furnishes evidence which speaks as loud and convincingly as oral testimony. The hand-writing of the signature, " Margaret Ophelia Gardiner " corresponds with all the other words which the witnesses testify were written by the testatrix in her own hand as she sat at the table. Her alleged handwriting bears no resemblance to the handwriting of the subscribing witnesses — that is, their names and addresses, either in formation of the letters and words or in width or dis-tinctness of the lines. That is, the witnesses' handwriting shows that each of them pressed down with the pen with a different degree of pressure or weight from that used by the testatrix. The alleged handwriting of the testatrix is distinct and legible, and shows repeated individual characteristics in the formation of the letters and words. It does not seem possible that a person of unsound mind could have filled in the blank spaces and written as well as the handwriting of this testatrix indicates.

If Mr. Thomas was acting fraudulently in attempting to have this lady execute a will, knowing her to be mentally incapable to perform the testamentary act, it does not seem reasonable that he would have left all the blank spaces for names and dates to be filled in by her. Instead of running the risk of her spoiling the instrument by making some mistake, he would have adopted the easiest course, that of typewriting everything except her signature. However, here we have good, legible handwriting, and words filled in, in their proper connection.

If she could write as well as appears in this instrument, she surely must have been able to read and understand what she read.

To argue that some one other than the testatrix wrote the words and figures stated to be made by her, would imply branding these three witnesses as perjurers.

As to the contention that the testatrix should have given her little property to some relative other than Atzroth, it is impossible from the testimony to pick out from the seventy odd cousins the particular relative or relatives who should have received her prop-erty. It may here be remarked in passing that none of the adults have filed any objections to probate. The special guardian for the infants and one person in an asylum, in what he considers the performance of his duty, has filed the only objections.

Louis Atzroth and his wife, who was a relative, had brought to her butter, eggs and other food from time to time, and visited her. In different parts of the testimony there is evidence that

she entertained a very friendly feeling toward Atzroth. During her sickness several months prior to the execution of the will, others of her relatives were with her at times, and it is very possible that they had displeased her in some way. Indeed one witness makes reference to her attitude towards Atzroth in that he had been good to her and that he did not make her nervous or talk back to her or tell her what to do or " boss her around."

No witness gives the exact age of the testatrix when the will was executed, one giving it around sixty or sixty-five, another that she was between sixty-five and seventy. It is well known that elderly persons of perfectly sound mind, especially those who have lived alone, are very averse to being dictated to by others, not closely related to them. Furthermore who has not felt more generously inclined toward some persons who are not relatives than to some of one's relatives? The contention that the testatrix was not of sound and disposing mind chiefly rests upon the testimony of the physician who treated her in about the latter part of July, 1919 (about one year and ten months before the execution of the will), when she had what the doctor characterized as " cerebral paralysis;" what is commonly known as a " shock." He states that he found her unconscious, that " one side was paralyzed — the arm and the leg, and the face was drawn and she was unable to speak and had to be put to bed."

The doctor was very indefinite in fixing the dates of certain occurrences, fixing them about such and such a time after the shock. In part of his testimony he states that the " shock " was in 1919 and in another part as 1920, and later stated that he had made a mistake in the year and recurred to the year 1919. He swore that he could not remember whether it was her right or left side that was paralyzed. He says he treated her for heart trouble about two years before the paralytic condition.

On cross-examination, on being asked whether the paralysis continued until her death he answered " certainly, yes — not total — I don't mean paralysis that she couldn't walk or couldn't move or talk or anything like that — but there was a depression there." Being asked whether there was ever a time when her arm or hand was so paralyzed that she could not use it he answered " Yes. Q. How long did that last? A. I should say about a month — the total paralysis. Q. From that time on she was able to use it? A. Some — a little, but she had to have care all the while. Q. How long was her leg paralyzed? A. I think — as near as I can remember I should say about the same — those things usually clear up together to a certain extent. Q. After a month she was able to use that leg so she could walk around? A. I

don't think so — no.  Q. Didn't she ever walk?  A. No, I don't think she was able to walk around for a couple of months.  I think they got her around in a chair.  Q. About two months on she was able to use that leg so she could walk around?  A. I wouldn't say positively.  Q. In 1921 she was able to use that leg, wasn't she?  A. Yes.  Q. She walked around the house, didn't she?  A. Yes, she got around.  Q. And in different rooms?  A. Yes."

The doctor says he attended her " once in a week or two " in the year 1921 — about thirty-five or forty times, and in the fall of the year 1920 she personally paid him seventy-five dollars or eighty dollars for his prior services, she paying him in cash, and understood what she was doing.

He said he could not definitely state how often he attended Miss Gardiner in the year 1921 prior to June eighteenth, but afterwards says " say nine or ten times."  He says: " I was going to see her maybe once in one to three weeks.  She was taking medicine and the medicine would last a couple of weeks."  In answer to the question: " You can't tell when the last time you treated her in June, 1921, before June 18th was," he answered: " No," and further said: " Possibly the last of May."  He further says that in May or June, 1921, he does not recollect any particular thing that indicated irrationality.

The doctor does not specifically tell for what trouble or disease he treated her in 1920 and 1921, whether for the old ailment of " heart trouble " which she had in 1917 or 1918 or something else. The doctor gave a few incidents and acts of Miss Gardiner which he thought were irrational, among which was her not noticing that the house was full of gas, and being dirty and saying that there was no meat in the house when there was salt pork down cellar, and her being in error as to who was at the house, giving these incidents as happening in 1921.  Afterwards he places the gassing incident in 1920, at about the time she first paid him for his services, and places the salt pork incident in 1920.

Again the doctor was asked: " Was it in 1921, prior to June 18, when she told you about hearing folks talking on the outside of the house?  A. I couldn't state just when.  It was prior to your date.  Q. Was it in that year?  A. I couldn't say."  These last questions were in relation to the doctor's prior testimony in which he implied that it was in the year 1921.

The doctor's uncertainty as to dates is impressive.  Considering the fact that he placed the date of the stroke as " 1919 " in one part of his testimony and in another as " 1920 " and the fact that the stroke did occur in 1919, the probability is that in giving the

date of certain occurrences as in certain years, at one time he took the year 1919 as the date from which he reckoned, and in other parts of his testimony took the year 1920 as the date from which he reckoned subsequent events.

However, whether some of the incidents which he calls irrational happened in 1919, 1920 or 1921, there is nothing probative of the conclusion that the testatrix was not competent to make a will.

As to her not noticing that the stove was gassing, that is a circumstance familiar to every one. As to her saying that she did not have any meat in the house to eat, when there was salt pork in the house or when there was other food setting around in the house, which neighbors had brought in (and it is not stated what the food consisted of), every one also knows that "there is nothing in the house to eat" is often said by people of all ages and all degrees of health depending upon their state of appetite and what food they desire, and is no indication of their mentality. As to her being uncleanly in her apparel, it is a frequent experience with elderly people, especially with those who live alone, and the doctor admitted on cross-examination that the fact that she was not cleanly would not of itself make him think there was anything irrational about her.

Equally inconclusive are references to her speaking about going out at night at the side door to see if any one was at the front door, when they would not be there, and her locking her doors. If all the people who in the night have thought they "heard someone outside" and been in error, are of unsound mind, I fear there would be many incompetent testators. He also testifies as to "disconnected sentences" but does not give any of her language in that connection, so that the court might judge whether there was any irrationality in that respect. Is it reasonable that a person who did not know what she was about would have been left practically alone, to do her work and attend to her household duties?

To take detached, isolated remarks separated from their context and the circumstances under which they were uttered, over a period of two or three years, and base upon them the conclusion that a person is incompetent to make a will would be unreasonable indeed. In this case there were very few instances indeed which during the whole period between the shock in July, 1919, and the execution of the will on June 18, 1921, that the doctor would recall and designate as irrational. If the testatrix had been so bereft of understanding as to be incompetent, it is reasonable to suppose that the doctor would have been able to recall scores of instances, as would the neighbors who frequently dropped in to see her according to his testimony. It is common knowledge that people who have had a

" shock " recover from it and go about their ordinary work one or two months after the occurrence. They may not have the full use of their limbs but they may have an intelligent understanding of all the relations of life and normally conduct themselves. In this case there is no evidence of a later " shock," as frequently occurs, and she lived until June 24, 1926, which is given as the date of her death in the petition for probate. That is, she lived for seven years after the shock and five years after the execution of the will and lived practically alone, except during the brief periods when someone would be with her, and those periods were nearly all in the year 1919.

Aside from the doctor, the contestants produced three witnesses, one of whom swore that his wife was taking care of Miss Gardiner at some time in 1919. Another witness was a cousin and next of kin of deceased, the greater part of whose testimony was excluded under the rules laid down in *Griswold* v. *Hart* (205 N. Y. 384).

The other witness says she was at the home of Miss Gardiner in " raspberry time " in July, 1919, on a Sunday morning and Miss Gardiner was unconscious, lying on a couch; that a Mr. Hogeboom and his aunt or mother were there; that her clothing was very much soiled, and towards night she " sort of roused a little " and the witness went home five or six o'clock in the evening. Thus there was little testimony on the part of the contestants except that of the physician.

The evidence of proponent clearly proves that the testatrix was competent to make a will on the day the will was executed and has sustained the burden of proof, and on the whole proof the surrogate is satisfied that the will should be admitted to probate.

The following cases are cited as applicable to this case:

The court in *Sheldon* v. *Dow* (1 Dem. 503, 504) says: " The last will and testament of testatrix, which is here offered for probate, was executed on January 31st, 1881, when she was nearly eighty years of age. Although deceased left a sister and others, who would be benefited by the rejection of the instrument propounded, objections are filed only on behalf of the executor of a previous will. * * *

" Thaddeus, who was one of the principal beneficiaries in the previous will, bore no close relation to testatrix, and he does not even come into court to dispute the justice of the last will, or to assert his rights. The contestant is in court by force of a mere technical provision of the statute, and all those interested in the rejection of the will being of full age and not authorizing any appearance, the contestant appears in the attitude of a volunteer.

" Under such circumstances, proof of the mental incapacity

56

of testatrix should be of unusual force to justify a court in rejecting the will."

In *Horn* v. *Pullman* (72 N. Y. 269, 276) the court says: " There is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body.   Such a rule would be dangerous in the extreme, and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property, and the scope, meaning and effect of the provisions of the will.   *   *   *

"A testator has a right to dispose of his estate in any way he may deem best.   He is not required to make an equitable will, and he may if he choose exclude his children, or divide his estate among them unequally.   The question in all such cases is, was the will the free act of a competent testator."

The following is the language of the able surrogate and author of a standard work on surrogate's practice, Surrogate HEATON, in *Matter of Winne* (50 Misc. 113, 115): " If we concede that there were times when the deceased was mentally incompetent, then we must have proof that the character of that incapacity, and the nature of the disease which caused it, made it impossible that she could at other times regain her mental power and be competent as testified to by the proponent's witnesses.   The whole evidence must prove that this character of incompetency was permanent when once established.   That is not the evidence nor the fact.

" It is well established by medical experience that loss of mind brought on by hemorrhage of the brain is not often complete, where the patient survives the attack, and is invariably transitory and recurrent thereafter.

" We must, then, conclude that this character of evidence establishes only a condition in which a person may be incompetent one day or one week and competent the next day or the next week. Therefore we must ascertain the actual condition of the deceased on the day the will was executed."

In *Matter of Armstrong* (55 Misc. 487, 494) the court says: " From the cases upon the subject of testamentary capacity, it seems clear that evidence, no matter what its character, which does not deal with the mental condition of the testator at the time of the testamentary act, is of little value.   *   *   *

" There is no evidence of any word or act on the part of any one designed to, or which did, in the slightest degree, influence the testator in the disposition of his property.

" ' It is not sufficient to establish that a will was obtained by

undue influence, that the person accused of practicing it had an opportunity so to do, because the fact that such an opportunity existed does not raise the presumption that advantage was taken of it.'    *Matter of Spratt,* 4 App. Div. 5; *Matter of Bedlow,* 67 Hun, 408; *Cudney* v. *Cudney,* 68 N. Y. 148."

In *Matter of McCabe* (75 Misc. 35, 36) the court says: " The allegation of undue influence has not been sustained.    It is not sufficient to rely on the relations of testatrix to the beneficiaries of the will.    Undue influence cannot be assumed to exist by reason of mere opportunity to exert the same, but such influence must be established affirmatively.    *Matter cf McCarty,* 141 App. Div. 816; followed in 71 Misc. Rep. 378; *Matter of Gihon,* 44 App. Div. 621, 622; *Cudney* v. *Cudney,* 68 N. Y. 148.    *    *    *

" The only remaining question then is as to the sufficiency of the execution.    The Statute of Wills provides for a greater number of attesting witnesses than two, and no presumption against this will is offered by the fact that there were three attesting witnesses to its execution.    It is true that one of the witnesses had forgotten nearly all the essentials to due execution.    The presumption is not against the sufficiency of execution because of such forgetfulness. . The testimony of the other two was, in any event, precise and sufficient to prove that the execution of the paper propounded conformed with all the requirements of the Statute of Wills.    The testatrix subscribed the will by her mark at the foot of the will.    Such subscription was the testatrix' own."

*Dobie* v. *Armstrong* (160 N. Y. 584, 593) holds: "A man's testamentary disposition of his property is not invalidated, because its provisions are unequal, or unjust, or the result of passion, or of other unworthy or unjustifiable sentiments.    It is natural and, therefore, usual to make provision for a child; but, under our governmental institutions, no obligation to do so is imposed upon the parent and the presumption of validity is not affected by the failure to do so, alone.    Nor is the presumption in favor of a will overcome by showing that the testator was of advanced age, or of enfeebled condition of mind or body.    (*Horn* v. *Pullman,* 72 N. Y. 269.) "

In *Hagan* v. *Sone* (174 N. Y. 317, 321) the court says: " But old people must, or at least may be permitted to make wills, and the fact that they may have lost much of the mental vigor of their earlier days does not prove or tend to prove that their testamentary acts are invalid.    *    *    *    Wills are not to be set aside by juries except for the gravest reasons.    A person has the right to dispose of his property in such way and to such persons as he thinks best. It is only in a case where there is substantial proof of mental inca-

pacity, or of undue influence, that courts or juries may annul his testamentary act."

In *Matter of Dunn* (184 App. Div. 386, 388) the court says: " In considering the evidence in a case of this character it is important to view the proposed will, in connection with the presumptions arising out of the due and orderly execution of the same, and if we find that the instrument itself is one which is, under all the circumstances, one consistent with the environment in which the testator found himself, trifling incidents, spreading over a considerable time, will not be permitted to defeat the declared purpose of a testator."

The motion of the special guardian at the end of the case to dismiss the proceeding and that the will be denied probate is denied and an exception allowed the contestants.

The surrogate is satisfied that the instrument propounded as the last will and testament of the deceased is genuine and valid and duly and legally executed; that at the time of the execution the testatrix was in all respects competent to make a will and was not under restraint, and that the said instrument should be admitted to probate as the last will and testament of said deceased, and a decree will be entered accordingly.